

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| MICHAEL P. HENNESSY, ) | |
| ) | |
| Plaintiff, ) | Case No. 07 C 6923 |
| ) | |
| v. ) | Magistrate Judge |
| ) | Martin C. Ashman |
| MICHAEL J. ASTRUE, Commissioner ) | |
| of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Michael P. Hennessy ("Hennessy"), seeks review of a final decision of Defendant, Michael J. Astrue, Commissioner of Social Security ("the Commissioner"), denying his application for disability insurance benefits ("DIB") and supplemental security income ("SSI"). Before the Court are Plaintiff's Motion for Summary Judgment or Remand and Defendant's Motion for Summary Judgment. The parties have consented to have this Court conduct any and all proceedings in this case, including the entry of final judgment, pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1(c). For the reasons stated below, the Court finds that the Commissioner's decision denying Hennessy's claim for DIB and SSI must be reversed and the case remanded for further proceedings consistent with this opinion.

### I. Background

Hennessy was born on May 30, 1958, making him forty-eight years old at the time of his hearing before an Administrative Law Judge on February 12, 2007. (R. at 59, 308.) He is five

feet, five inches tall and weighs approximately 182 pounds. (R. at 201.) His highest level of academic achievement is the twelfth grade. (R. at 318.) Hennessy's past work experience was as a roofer working at a "heavy" to "very heavy" exertional level. (R. at 72, 342.)

On November 29, 2004, Hennessy filed applications for SSI and DIB, alleging that he had been disabled since August 31, 2001, as a result of severe arthritis, gout, and "bad knees." (R. at 59, 64.) Hennessy's applications were denied initially on March 8, 2005, and again upon reconsideration. (R. at 39-42, 45-47.) Hennessy then filed a request for a hearing before an Administrative Law Judge ("ALJ"); the hearing was held on February 12, 2007, before ALJ Judith Goodie. (R. at 49, 308.) Hennessy testified at the hearing, as did Vocational Expert ("VE") Michelle Peters. (*Id.*) On March 12, 2007, the ALJ issued a decision denying Hennessy's claims for benefits. (R. at 12-21.) When the SSA's Appeals Council denied Hennessy's request for review, the ALJ's decision became the final decision of the Commissioner. (R. at 4.) It is this decision that Hennessy seeks to have reversed and remanded.

### A.  Hennessy's Medical History

The Court will provide a brief summary of Hennessy's medical history as documented in the administrative record, focusing on those conditions that form the basis of his claim for disability: gout, arthritis, and knee problems.

On January 15, 1999, Hennessy was treated by Dr. P.K. Alexander for redness, tenderness, and swelling in his right big toe. (R. at 198-99.) He was diagnosed with gout and treated with Allopurinol. (R. at 199.) Dr. Alexander's notes indicated that Hennessy was to return if his symptoms did not get better. (R. at 199.) However, it appears that Hennessy's next

medical treatment took place some sixteen months later, when he was admitted to St. Margaret/Mercy Hospital for chest pain and elevated blood pressure. (R. at 155-56.) He was discharged with blood pressure medication after Dr. Alexander determined that his chest pain was most likely caused by inflamed pleura (the lining surrounding the lungs). (R. at 156.) Hennessy was treated again at St. Margaret/Mercy in November 2000, this time after he was attacked and hit in the head with a hammer. (R. at 119.) The results of this attack included a laceration, a cranial fracture, and a subdural hematoma that was treated with a craniectomy. (R. at 124-25, 131-32.) A CT scan performed on November 28, 2000, showed that the fracture was aligned normally and that the hematoma had resolved. (R. at 118.) However, while Hennessy was being treated for his head wound, a chest x-ray showed degenerative changes in his dorsal lumbar vertebrae. (R. at 130.) Hennessy made a third visit to the St. Margaret/Mercy emergency room in October 2002, complaining of dizziness and shortness of breath. (R. at 106.) A chest x-ray and EKG were unremarkable, but Hennessy tested positive for cocaine and was diagnosed with cocaine intoxication. (*Id.*)

More than a year later, in December 2003, Hennessy was treated by Dr. Chandra Anand for leg pain. (R. at 230.) Dr. Anand prescribed him Indocin, Probenecid, and Vicodin. (*Id.*) Hennessy next saw Dr. Anand in January 2004, this time complaining of left abdominal pain. (R. at 229.) In July 2004, Hennessy returned to Dr. Anand complaining of gout-related pain in his right elbow and foot and his left knee. (R. at 228.) Dr. Anand again prescribed Indomethacin, Indocin, and Probenecid. (*Id.*) Hennessy was treated again in February 2005 for foot pain. (R. at 227.) Dr. Anand diagnosed him with gouty arthritis, continued his treatment with Probenecid and Indocin, and added a prescription for Vicodin. (*Id.*)

On February 9, 2005, Dr. M.S. Patil examined Hennessy on behalf of the Bureau of Disability Determination Services in connection with Hennessy's disability claim. (R. at 200-206.) Dr. Patil found that Hennessy had a history of gout and that he reported gout flare-ups once or twice per month. (R. at 200.) Hennessy told him that during a gout flare-up, he can "barely walk, stand, lift or climb stairs." (*Id.*) Dr. Patil found no tenderness or deformities in Hennessy's back and reported that Hennessy had a normal range of motion. (R. at 202.) Examining Hennessy's hands, Dr. Patil found that Hennessy could perform the full range of fine and gross manipulative movements with both hands but noted "[m]ild old non-tender deformities of DIP and PIP joints" in both hands. (*Id.*) Dr. Patil also found that Hennessy had "some difficulty" walking on his heels and toes, getting up from a chair, and getting on and off of a table, as well as "great difficulty" squatting and rising. (R. at 203.) X-rays performed on the day of the exam showed "severe degenerative joint with disc disease" in the lumbosacral vertebrae and calcifications, osteopenia, and probable osteochondoitis dissecans in Hennessy's left knee and femur. (*Id.*) Based on Dr. Patil's exam, medical consultant Vincent Francis determined on February 28, 2005, that Hennessy could occasionally climb ramps and stairs, kneel, crouch, and crawl, but that he could never climb ladders, scaffolds, or ropes or be exposed to extreme cold. (R. at 207-214.) Based on these limitations, he concluded that Hennessy "should be able to perform light work activity." (R. at 214.)

On April 7, 2005, Dr. Anand completed a Residual Functional Capacity ("RFC") questionnaire on Hennessy's behalf. (R. at 215-223.) Dr. Anand indicated that he treated

Hennessy every four months[1] for gouty arthritis and that his prognosis was "poor." (R. at 215.) According to Dr. Anand, Hennessy's symptoms included pain, weakness, immobility, a reduced range of motion in his knees, elbows, hips, and shoulder, and numerous other symptoms affecting every joint in his body. (R. at 215-218.) In addition, Dr. Anand indicated that Hennessy's symptoms were constant and that they would affect his ability to concentrate and to deal with work-related stress. (R. at 219.) Dr. Anand opined that Hennessy could walk a maximum of one block without rest, sit for fifteen to twenty minutes at one time, stand for thirty minutes at one time, and sit for a maximum of four hours in an eight-hour workday. (R. at 220.) According to Dr. Anand, Hennessy would need to get up and walk for ten minutes at ten-minute intervals throughout the work day. (R. at 220-21.) Hennessy would require a job that allowed him to take unscheduled breaks and would need an assistive device, such as a cane, when standing or walking. (R. at 221.) Dr. Anand opined that Hennessy was limited in his ability to lift weights of ten pounds or more and that he would need to avoid exposure to numerous environmental factors. (R. at 222-23.) Finally, Dr. Anand indicated that Hennessy's impairment would produce "good days" and "bad days" and that Hennessy could be expected to miss more than three days of work per month as a result of his impairments. (R. at 223.)

Dr. Anand continued to treat Hennessy after completing the RFC questionnaire. On the same day that Dr. Anand completed the RFC form, Hennessy was treated for severe pain in the foot and legs. (R. at 226.) Dr. Anand also treated Hennessy at South Shore Hospital on August

---

[1] Hennessy's brief indicates that Dr. Anand claimed to treat Hennessy every month. (Pl.'s Br. at 5.) Although Dr. Anand's handwriting on the RFC form is far from ideal, there clearly appears to be a numeral before the word "month" that most resembles a "4". (R. at 215.) Moreover, "every 4 months" is consistent with Hennessy's treatment notes, which do not indicate that he was seen every month.

18, 2005, for severe pain and swelling in his hands, left ankle, and left foot. (R. at 233-245.) The diagnosis was acute gouty arthritis. (R. at 236.) An x-ray taken the next day showed abnormal changes consistent with rheumatoid arthritis in both hands. (R. at 244.) Hennessy returned to Dr. Anand with gout- and arthritis-related complaints in June and October of 2006 as well as in January 2007. (R. at 261-63.) At his June 2006 visit, Hennessy stated that he also had lower back pain radiating to his legs and that he was only able to sleep while seated in an armchair due to the pain. (R. at 263.)

Two days prior to Hennessy's February 12, 2007, hearing before the ALJ, Dr. Anand filled out a second RFC questionnaire. (R. at 283-290.) This time, Dr. Anand rated Hennessy's prognosis as "very poor" and noted that his symptoms included "severe swollen, tender, deformed joints" resulting in severe pain on movement that limited his mobility and rendered him unable to perform any kind of work. (R. at 283.) Dr. Anand indicated that Hennessy continuously experienced "sharp, stabbing, burning pain" that affected his spine at all levels as well as all of his extremities and joints on both sides. (R. at 284.) According to Dr. Anand, Hennessy's pain resulted in a limited range of motion as evidenced by the straight leg raising test, as well as muscle spasms, muscle weakness, and impaired sleep. (R. at 285.) Dr. Anand opined that these symptoms would constantly interfere with Hennessy's attention and concentration and markedly limit his ability to deal with work-related stress. (R. at 286.) In a departure from his prior RFC assessment, Dr. Anand indicated that Hennessy could now sit and stand/walk for less than two hours in an eight-hour workday. (R. at 287.) Dr. Anand also noted that Hennessy would need to take unscheduled one- to two-hour breaks once or twice per week, that his legs would need to be elevated while working, and that he was restricted to only occasional lifting of less than ten

pounds. (R. at 289.) As in his previous RFC evaluation, Dr. Anand indicated that Hennessy could be expected to miss work more than three times per month as a result of his impairment. (R. at 290.)

### B. Hearing Testimony

Hennessy provided oral testimony at his February 12, 2007, hearing before the ALJ. (R. at 317.) Hennessy stated that he had worked for twenty-four years for the same employer as a roofer, but that he had to quit in August of 2001 because he was taking too many days off due to arthritis in his knees, back, and hands. (R. at 318-19.) He testified that he lived with a friend in a second-floor apartment and that he had some difficulty using the stairs in the apartment building. (R. at 322.) He reported having problems with walking and stated that when his gout flares up he cannot walk to his mother's house, which is one block from his apartment. (R. at 323.) He stated that he normally walked with the assistance of a cane but admitted that he did not bring his cane with him to the hearing before the ALJ because he did not want to bring it on the train. (R. at 322-23.) Hennessy testified that he was able to help with household chores such as cooking and cleaning, although he sometimes had problems with the fine movements required to wash dishes or open cans and bottles. (R. at 324.) Hennessy acknowledged drinking beer even though he was aware that drinking alcohol can aggravate gouty arthritis; however, he disputed Dr. Anand's progress note indicating that he was drinking ten to twelve beers daily. (R. at 326-27.) Hennessy testified that he was drinking "a couple" of beers once or twice per week. (R. at 328.) He denied any cocaine use since his 2002 hospitalization. (*Id.*)

Hennessy testified that he was in pain every day. (R. at 329.) The pain made it difficult to walk and to sit for a prolonged period of time. (*Id.*) Hennessy reported difficulty walking longer distances and difficulty shifting positions from sitting to standing. (*Id.*) He also described difficulty with fine motor skills such as washing dishes or using buttons and zippers on clothing. (*Id.*) Hennessy testified that both of his hands were swollen and that the right hand was more painful than the left. (*Id.*) Vicodin was ineffective in ameliorating his constant joint pain. (R. at 330.) In addition to his hands, he reported severe, constant pain in his elbows, knees, feet, and back. (R. at 331.) Hennessy testified that he took Indomethicin, Colchicine, Probenecid, and Allopurinol for his gout in addition to Vicodin for the pain. (R. at 332.) Hennessy admitted that he did not take Indomethicin every day as prescribed but instead saved it for days when his inflammation was particularly bad in order to save money. (R. at 334.)

During the hearing, the ALJ noted that Hennessy stood up while testifying in order to relieve his discomfort. (R. at 333.) Hennessy testified that he could stand for about an hour and sit for about forty-five minutes before becoming uncomfortable. (R. at 337.) Hennessy stated that he could lift a gallon of milk if he used both hands and that he could walk about one block, although he could walk further if he pushed himself. (R. at 336.) He testified that he had walked three blocks to the train on the morning of the hearing. (*Id.*) However, Hennessy noted that when his gout flared up, he could not walk at all, with or without a cane. (R. at 338.) He estimated that this would happen approximately every two weeks, but would sometimes happen twice in one week. (*Id.*)

Vocational Expert ("VE") Michelle Peters also testified at Hennessy's hearing. The ALJ asked her to consider an individual with Hennessy's age and background who could lift and carry

less than ten pounds; sit, stand, and walk for four hours; push and pull less than ten pounds; occasionally climb stairs and ramps, stoop, crouch, crawl, and kneel; and frequently use both hands for fine and gross movements without limits on reaching. (R. at 344-45.) The ALJ further stated that this individual could not use ladders, needed to elevate his feet, and needed to avoid concentrated exposure to extreme heat and cold, humidity, and airborne irritants. (*Id.*) The VE testified that such an individual could perform an information clerk position and that 900 information clerk jobs existed in the regional economy. (*Id.*) If the individual also required an option to sit or stand throughout the workday, the number of positions would be reduced to 500. (*Id.*) However, if the individual could only occasionally perform fine manipulation with his hands, there would be no positions available. (R. at 347.) The VE also testified that in the national economy employers tolerate a maximum of two sick days per month. (R. at 348.)

## II. The ALJ's Decision

In a decision dated March 12, 2007, the ALJ made the following findings:

1. The claimant meets the non-disability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through his alleged onset date.

2. The claimant has not engaged in substantial gainful activity since the alleged onset date of disability.

3. The claimant has a "severe" impairment: rheumatoid arthritis of the hands, bilaterally; gout; hypertension, controlled on medication; osteopenia affecting the left knee; severe arthritis affecting the lumbar spine at L5-S1 and arthritic changes at L4, L5; and status post craniotomy (November 2000). 20 CFR §§ 404.1520(c) and 416.920(c).

4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.      The Judge finds that the claimant's allegations regarding his limitations are not credible for the reasons set forth in the body of the decision.

6.      The Judge finds that the claimant, despite his limitations, retains the residual functional capacity to perform a limited range of light level work activity: He can lift/carry less than 10 pounds, sit for about four hours during the course of an eight hour workday, stand/walk for about four hours during the course of an eight hour workday, and push and pull less than 10 pounds, with occasional postural movements, no work around ladders, he must elevate his legs 12 inches while seated, he can perform frequent fine and gross manipulative actions bilaterally, with no limits in reaching, but must avoid concentrated exposure to heat, cold, humidity, and airborne irritants, and he would be absent from work from 3/4 of a day to 2 days per month.

7.      The claimant is unable to perform his past relevant work (20 CFR §§ 404.1565 and 416.965).

8.      The claimant is a "younger individual between the ages of 45 and 49" (20 CFR §§ 404.1563 and 416.963).

9.      The claimant has a "high school education" (20 CFR §§ 404.1564 and 416.964).

10.     The claimant has the residual functional capacity to perform a significant range of light work (20 CFR §§ 404.1567 and 416.967).

11.     Although the claimant's exertional and nonexertional limitations do not allow him to perform the full range of light work, using Medical-Vocational Rules 202.221, 202.22, 201.28, and 201.29 as a framework for decision-making, there are a significant number of jobs in the Chicago six county regional economy that he could perform. An example of such jobs cited by vocational expert Peters is the job of information clerk (900 jobs cited). The vocational expert testified that the exertional and skill levels of the enumerated jobs are consistent with the Dictionary of Occupational Titles (DOT). SSR 00-4p.

12.     The claimant, therefore, was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR §§ 404.1520(g) and 416.920(g)).

(R. at 19-20.)

Hennessy argues that the ALJ's decision is flawed and must be reversed for several reasons. First, he argues, the ALJ committed reversible error when she failed to give controlling weight to the opinion of Dr. Anand, Hennessy's treating physician. Next he argues that the ALJ was obligated to obtain an updated medical opinion regarding Hennessy's condition rather than rely on the opinion of the agency physician, which was rendered two years prior to the decision. Third, Hennessy argues that the ALJ erred in finding that his testimony regarding his impairments was not credible. Finally, Hennessy claims that the ALJ failed to meet her burden of showing that Hennessy was capable of performing jobs that existed in significant numbers in the regional economy, arguing that the 900 information clerk positions identified by the VE did not constitute a "significant" number of jobs.

### III. Discussion

#### A.  Standard of Review

This Court will uphold the ALJ's decision "if it is supported by substantial evidence and is free of legal error." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002) (citing 42 U.S.C. §405(g)). Substantial evidence is evidence that "a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In reviewing the ALJ's decision under the substantial evidence standard, this Court will not reweigh the evidence or substitute its judgment for the judgment of the Commissioner. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). However, the Court will not act as a "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). Rather, this Court must ensure that the ALJ has articulated her analysis of the case at some minimal level. *Dixon v. Massanari*,

270 F.3d 1171, 1176 (7th Cir. 2001). This means that the ALJ's decision must build "an accurate and logical bridge from the evidence to her conclusion." *Steele*, 290 F.3d at 941 (internal quotation and citation omitted). It also requires that the ALJ "confront evidence that does not support [her] conclusion and explain why it was rejected." *Kasarsky v. Barnhart*, 335 F.3d 539, 543 (7th Cir. 2003). If the ALJ's decision does not meet these minimum requirements because it "lacks evidentiary support or is so poorly articulated as to prevent meaningful review," this Court will reverse and remand the decision. *Steele*, 290 F.3d at 940.

### B. The Five-Step Inquiry for Benefits Determination

In order to qualify for disability benefits, a claimant must demonstrate that she is disabled. An individual is considered to be disabled when she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). A claimant is considered to be "unable to engage in substantial gainful activity" when she is unable to perform her previous work or engage in any other kind of substantial work that exists in the national economy. 42 U.S.C. § 423(d)(2)(A). In order to determine whether a claimant is disabled under the statute, the ALJ employs a five-step inquiry:

> In the first step the ALJ considers the applicant's present work activity. Second, the ALJ weighs the severity of the applicant's impairment. The impairment or combination of impairments must severely restrict an applicant's physical or mental ability to perform basic work activities or an ALJ should enter a finding of not disabled. Third, the ALJ decides whether the impairment or combination of impairments meets or equals an impairment listed within the regulations which are conclusively disabling. If an ALJ is unable to make a disability determination

> in the first three steps, then the process proceeds to an assessment of the
> applicant's residual functional capacity (RFC). At the fourth step, the ALJ
> determines whether the RFC prevents the applicant from performing his or her
> past relevant work. If not, in the fifth and final step the ALJ uses the assessment
> of RFC to determine if the applicant can make an adjustment to other work based
> on the applicant's age, education, and work experience.

*Arnold v. Barnhart*, 473 F.3d 816, 820-21 (7th Cir. 2007) (internal citations omitted). The claimant has the burden of proof as to the first four steps, while at step five the burden shifts to the Commissioner to show that the claimant's residual functional capacity allows her to do some work within the national economy. *Clifford*, 227 F.3d at 868.

In this case, the ALJ found at step one that Hennessy had not engaged in substantial gainful activity since the alleged onset of his disability. At step two, the ALJ found that Hennessy's impairments were "severe," but at step three she found that they did not meet or equal any listed impairment. At step four, the ALJ found that Hennessy retained the RFC to perform a significant range of light work. At step five, the ALJ relied on the VE's testimony to conclude that Hennessy could perform the tasks of an information clerk, a job existing in significant numbers in the regional economy.

### C. The Treating Physician's Opinion

Hennessy argues that the ALJ erred when she failed to give controlling weight to the opinion of Dr. Anand, Hennessy's treating physician. Dr. Anand opined in his RFC report dated February 10, 2007, that Hennessy was unable to perform any kind of work, that he could sit and stand for fewer than two hours in an eight-hour workday, that his constant pain severely limited his ability to use his hands and to concentrate, and that he could be expected to miss more than

three days of work per month as a result of his impairments. (R. at 283-90.) Nonetheless, when formulating Hennessy's RFC and posing hypotheticals to the VE, the ALJ found, inter alia, that Hennessy could sit and stand for up to four hours in an eight-hour workday, that he could perform fine and gross movements with his hands, and that he would miss up to two days of work per month as a result of his impairments. (R. at 16-17.) The ALJ noted that this RFC finding was in conflict with Dr. Anand's 2007 report, but consistent with Dr. Anand's April 2005 report as well as the 2005 report of the consulting physician. (R. at 17.)

Addressing the role of the treating physician's opinion in the disability determination process, the Seventh Circuit has stated that "more weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and circumstances . . . . A treating physician's opinion . . . is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Clifford*, 227 F.3d at 870 (internal citation omitted). When an ALJ does not give controlling weight to the treating physician's opinion, the ALJ must "provide good reasons for the weight given to that opinion and specifically consider length of treatment relationship, frequency of treatment, nature and extent of treatment relationship, supportability, consistency, and specialization." *David v. Barnhart*, 446 F.Supp. 2d 860, 871 (N.D. Ill. 2006); *see also* 20 C.F.R. § 404.1527(d). Despite this deference to the treating physician, the ALJ must make the ultimate determination on the issue of disability. *Clifford*, 227 F.3d at 870.

In this case there were two opinions from Hennessy's treating physician: one from April 2005 and another from February 2007. In both reports, Dr. Anand diagnosed Hennessy with severe gouty arthritis, but his February 2007 report indicates more severe impairments,

including an inability to sit, stand, or walk for two hours in an eight-hour workday, an inability to walk one block without rest, the need for numerous unscheduled breaks throughout the day, and the need to miss work more than three times per month. In addition, the February 2007 report details severe limitations in Hennessy's ability to use his hands. The ALJ declined to adopt Dr. Anand's findings and found that Hennessy had the RFC for light work, which the ALJ found was consistent with Dr. Anand's earlier 2005 report as well as the 2005 report of the consulting physician.

The Court finds that the ALJ erred in rejecting Dr. Anand's February 2007 opinion. As the Seventh Circuit has stated, "if [a treating physician's opinion] is well supported and there is no contradictory evidence, there is no basis on which the administrative law judge, who is not a physician, could refuse to accept it. Equally obviously, once well-supported contradicting evidence is introduced, the treating physician's evidence is no longer entitled to controlling weight." *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006). In this case, there was no conflicting medical opinion to undermine Dr. Anand's February 2007 report because the consulting physician examined Hennessy two years earlier, in February 2005. It is logically impossible for a report issued in early 2005 to reflect changes in Hennessy's condition that may have taken place over the next two years. The record shows that Hennessy was treated for gout multiple times in that two-year period, even going so far as to visit the hospital. Only Dr. Anand's February 2007 medical opinion takes that history into account, and it cannot be discredited by a report issued two years earlier that was not based on Hennessy's full medical history.

The ALJ's explanation of her decision not to give controlling weight to Dr. Anand's February 2007 opinion, when stripped of its references to the outdated 2005 consultative opinion, is insufficient. First, the ALJ states that Dr. Anand's February 2007 opinion is inconsistent with his treatment notes because he observed edema in Hennessy's legs in April 2005 and October 2006 but not in February 2005 and February 2006. (R. at 17.) Without any expert opinion about the possible significance of these findings—for example, medical testimony that a person with severe gouty arthritis would *always* exhibit leg edema—it appears that the ALJ made her own independent medical finding, impermissibly succumbing to the "temptation to play doctor." *Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003); *see also Rohan v. Chater*, 98 F.3d 966, 970-71 (7th Cir. 1996) (ALJs may not make independent medical findings). The ALJ also justifies her rejection of Dr. Anand's opinion by noting that Dr. Anand did not make laboratory findings regarding Hennessy's hands and that Dr. Anand relied on Hennessy's subjective statements about his symptoms in forming an opinion regarding his RFC. (R. at 17.) This justification carries no weight in the absence of any expert medical opinion indicating that these methods were not medically appropriate or that Dr. Anand should have done something different.

Without any current medical evidence contradicting Dr. Anand's opinion or calling his methodology into question, the ALJ's conclusion that his opinion was not supported by "acceptable clinical and laboratory diagnostic techniques" is without competent support. Because the ALJ failed to provide adequate reasons for denying controlling weight to Dr. Anand's report stating that Hennessy was in fact disabled, the case must be remanded. The Court's holding on this issue necessarily resolves Hennessy's argument that the ALJ was

obligated to obtain an updated medical opinion regarding Hennessy's mobility. As discussed above, the ALJ may not rely on the 2005 consultative opinion to impeach Dr. Anand's February 2007 opinion. Nor can the ALJ substitute her own lay opinion for that of a physician. Consequently, on remand, the ALJ may either accept Dr. Anand's opinion or obtain an updated medical opinion taking into account Hennessy's condition after February 2005.

### D.     The ALJ's Credibility Determination

An ALJ's credibility determination is a finding of fact, and, as such, is entitled to special deference from a reviewing court. *Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004). Because the ALJ is in the best position to observe witnesses and determine their truthfulness, the Court will only overturn the ALJ's credibility determination if it is patently wrong. *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004). SSR 96-7p requires the ALJ to specify the reasons for her credibility determination "so that the applicant and subsequent reviewers will have a fair sense of the weight given to the applicant's testimony." *Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003). The Court reviews the reasons given by the ALJ in a "common-sensical" fashion rather than "nitpicking" at them; however, the ALJ must still "build a logical bridge" between the record and her conclusions, and the Court must reverse where the ALJ's reasons are "without support in the record or are patently insufficient to support [her] conclusion." *Shramek v. Apfel*, 226 F.3d 809, 811-12 (7th Cir. 2000) (internal quotes and citation omitted).

In this case, the ALJ acknowledged that Hennessy's subjective complaints of pain were a crucial issue, but found that his credibility was "somewhat suspect" and that his testimony "exaggerate[d] the extent and duration of his symptoms." (R. at 18.) In support of her credibility

finding the ALJ noted that Hennessy claimed to have stopped working in August 2001 because of the pain from his gouty arthritis, but was hospitalized in October 2002 for cocaine intoxication. From these two events, the ALJ surmised that "drug abuse may be implicated in his lack of work." (*Id.*) The ALJ also observed that Hennessy "saw his previous doctor [Dr. P.K. Alexander] for gout only once in 1999 and that physician refused a request to submit a report in January 2005." (*Id.*) It is difficult to identify the "logical bridge" that connects these isolated facts to a finding that Hennessy was not truthful in his testimony. With no evidence that Hennessy used cocaine on a regular basis, or that he used it prior to October 2002, fourteen months after he last worked, the connection between his loss of employment and his use of illegal substances seems to be a matter of sheer speculation. It is similarly unclear why the unwillingness of a physician to give a report on a patient whom he treated on two occasions five years earlier implies anything about the merits of Hennessy's claim.

The final basis that the ALJ articulates for rejecting Hennessy's testimony is the conflict between his reported symptoms and the objective medical findings in the record. The ALJ points to Dr. Patil's finding in February 2005 that Hennessy had normal motor function and strength in his hands. However, the ALJ does not discuss any of the medical evidence provided by Dr. Anand that tends to support Hennessy's claim, which is substantial. An ALJ is not required to discuss every piece of evidence in the record; however, she may not discuss only that evidence which supports her position. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).

The Commissioner's brief before this Court argues that there were other facts in the record that could support the ALJ's finding that Hennessy's testimony was not credible. (Def.'s Br. at 10.) Whether or not the factors identified by the Commissioner influenced the ALJ's

finding, they are not articulated in the ALJ's discussion of Hennessy's credibility. The ALJ is required to articulate the reasons for her credibility finding so that the claimant and the reviewing court will have a fair sense of the weight given to the claimant's testimony and why it was given that weight. *Golembiewski*, 322 F.3d at 916. Even assuming that the reasons articulated by the Commissioner would have been sufficient, they were not articulated in the ALJ's discussion of credibility. Taken as a whole, the ALJ's reasons for rejecting Hennessy's crucial testimony regarding the severity of his symptoms are "patently insufficient" to support her conclusion, and the case must be remanded. On remand, the ALJ is not required to find Hennessy's testimony credible, but she must articulate substantial evidence that a "reasonable mind might accept as adequate to support [her] conclusion." *Richardson*, 402 U.S. at 401.

### E. The "Significance" of 900 Information Clerk Positions

Hennessy's final argument is that the ALJ erred in finding that the 900 information clerk jobs identified by the VE as existing in the regional economy constituted a "significant number of jobs" to which Hennessy could adapt. Having reversed several aspects of the ALJ's opinion and remanded the case for further proceedings, the Court declines to address this issue, as it may become moot if the ALJ changes her evaluation of Hennessy's RFC upon further consideration.

### III. Conclusion

For the reasons set forth above, the decision of the Commissioner denying Hennessy's application for disability benefits is reversed and remanded for further proceedings consistent with this opinion.

**ENTER ORDER:**

*[signature]*

**MARTIN C. ASHMAN**
United States Magistrate Judge

Dated: November 21, 2008.